UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUSTIN FRIAR, PAUL COUREY, RAYNA FEDORCZYK, and MARIA MELO on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>WEBSTER FINANCIAL CORPORATION, WEBSTER BANK, N.A.,<br><br>*Defendants.* | Case No. 3:23-cv-00628<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Justin Friar ("Plaintiff Friar"), Paul Courey ("Plaintiff Courey"), Rayna Fedorczyk ("Plaintiff Fedorczyk"), and Maria Melo ("Plaintiff Melo" and collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, assert the following against Defendants Webster Financial Corporation, ("Webster Financial") and Webster Bank, N.A. ("Webster Bank" and together with Webster Financial, the "Defendants"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## **INTRODUCTION**

1.     Plaintiffs bring this class action against Defendants for their (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation, names, bank account numbers, and Social Security numbers (collectively "PII"); (ii) failure to comply with industry standards to protect information systems that contain PII; (iii) unlawful disclosure of the PII of Plaintiffs and other members of the class; and (iv) failure to provide adequate notice to Plaintiffs and other members of the class that their PII had been disclosed and compromised.

2.      Defendants operate Webster Bank, a nationally chartered commercial bank with "over $70 billion in assets" based in Stamford, Connecticut. Webster Bank "offer[s] digital and traditional service delivery through our differentiated lines of business: Commercial Banking, Consumer Banking and HSA Bank, one of the country's largest providers of employee benefits solutions."[1]

3.      Plaintiffs, Webster Bank customers, are among the hundreds of thousands of individuals who shared their most valuable data with Webster Bank based on the ordinary and reasonable understanding that their sensitive PII would be handled and maintained with appropriate safety standards—the very services that Webster Bank boasts it performs to protect its customers.

4.      Despite Defendants representations that Webster Bank provided robust data protection services, in reality, Webster Bank's security program (and the program of the vendors Webster Bank entrusted information to), its decision-making regarding which vendors to entrust customer data to, and its monitoring of those vendors, were all woefully inadequate. Webster Bank and its agents' unsound, vulnerable systems containing valuable data, including Plaintiff and class member PII, were an open invitation for intrusion and exfiltration by cybercriminals, who were seeking to exploit this valuable information.

5.      Defendants shared Plaintiffs' and class members' sensitive PII with various third-party vendors Defendants engaged to assist Webster Bank with its operations, including Guardian Analytics, Inc.. Webster Bank retained Guardian Analytics to provide fraud detection services for Webster Bank and its customers, including Plaintiffs and class members.

---

[1] https://public.websteronline.com/about

6.     On January 26, 2023, the Defendants reportedly first learned that, beginning on November 27, 2022, an unauthorized third party obtained Plaintiffs' and class members' PII by accessing Defendant Guardian Analytics systems, downloading files containing names, bank account numbers, and social security numbers of tens of thousands of Webster Bank customers (the "Data Breach"). This unauthorized access continued undetected for nearly two full months, ending January 22, 2023. The stolen data, including PII, has already been found for sale on the dark web.

7.     Despite purportedly learning of the Data Breach on January 26, 2023, Webster Bank did not begin notifying the impacted individuals (including Plaintiffs) that their sensitive data was compromised, until April 10, 2023. This delay deprived Plaintiffs and class members of the opportunity to take meaningful steps to mitigate the impact of the Data Breach.

8.     The value of the Webster Bank customers' stolen data, including PII, is recognized by many different constituencies. First, the value is recognized by the Defendants themselves. Second, the value is recognized by cybercriminals who exploit this data to commit identity theft and fraud. And third, the value is recognized by the individuals, themselves, including Plaintiffs and class members, whose PII was stolen.

9.     As a result, Plaintiffs and class members are at substantially increased risk of future identity theft, both currently and for the indefinite future.  Plaintiffs' and class members' PII—including their bank account numbers and Social Security numbers which were compromised by cyber criminals in the Data Breach—is highly valuable to bad actors who may seek to commit fraud and identity theft.

10.     Plaintiffs, on behalf of themselves and all others similarly situated, bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, breach of

confidence, invasion of privacy— intrusion upon seclusion, violations of consumer protection

statutes of their home states, violations of data protection statutes of their home states, and

injunctive relief claims.

11.     Plaintiffs seek damages and injunctive relief requiring Defendants to adopt

reasonably sufficient practices to safeguard the PII in Defendants' custody and control in order to

prevent incidents like the Data Breach from recurring.

12.     Given that information relating to the Data Breach, including the systems that

were impacted and the configuration and design of Webster Bank's website and all Defendants'

systems, remain exclusively in Defendants' control, Plaintiffs anticipate that additional

information in support for their claims will emerge during discovery.

## PARTIES

13.     Plaintiff Friar is a citizen and resident of the State of Connecticut. Plaintiff Friar

received a data breach notice letter dated April 10, 2023 from Webster Bank notifying Plaintiff

Friar that his PII had been compromised as a result of a "data security incident that affected

Guardian Analytics, Inc. a third-part vendor that provides fraud detection services to Webster

Bank."

14.     Plaintiff Courey is a citizen and resident of the State of Connecticut. Plaintiff

Courey received a data breach notice letter dated April 10, 2023 from Webster Bank notifying

Plaintiff Courey that his PII had been compromised as a result of a "data security incident that

affected Guardian Analytics, Inc. a third-part vendor that provides fraud detection services to

Webster Bank."

15.     Plaintiff Fedorczyk is a citizen and resident of the State of Connecticut. Plaintiff

Fedorczyk received a data breach notice letter dated April 10, 2023 from Webster Bank notifying

Plaintiff Fedorczyk that her PII had been compromised as a result of a "data security incident that affected Guardian Analytics, Inc. a third-part vendor that provides fraud detection services to Webster Bank."

16.     Plaintiff Melo is a citizen and resident of the Commonwealth of Massachusetts. Plaintiff Melo received a data breach notice letter dated April 10, 2023 from Webster Bank notifying Plaintiff Melo that her PII had been compromised as a result of a "data security incident that affected Guardian Analytics, Inc. a third-part vendor that provides fraud detection services to Webster Bank."

17.     As a result of the Data Breach, Plaintiffs made reasonable efforts to mitigate its impact after receiving their notification letter, including but not limited to: researching the Data Breach and Defendants; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud and/or freezing their credit.

18.     As a result of the Data Breach, Plaintiffs have suffered emotional distress as a result of the release of their PII, which they believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using their PII for purposes of identity theft and fraud. Plaintiffs are very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

19.     Plaintiffs suffered actual injury from having their PII compromised as a result of the Data Breach including, but not limited to (a) loss of the value of their PII, a form of property that Defendants obtained from Plaintiffs; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; (d) benefit of the bargain damages, and (d) nominal damages.

20.     As a result of the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Plaintiffs will continue to be at a certainly impending and increased risk of identity theft and fraud for years to come.

21.     Defendant Webster Financial is the holding company for Webster Bank. Webster Financial is publicly traded and is regulated by the Federal Reserve Board of Governors. Webster Financial was incorporated under the laws of Delaware in 1986, and maintains its principal place of business in Waterbury, Connecticut.

22.     Defendant Webster Bank is a national bank organized under the laws of Delaware with its principal place of business at 200 Elm Street, Stamford, Connecticut 06902.  Webster Bank describes itself as "a leading commercial bank in the Northeast."   Webster Bank operates in Connecticut, Massachusetts, Rhode Island, and metropolitan New York City, providing banking services to consumers, businesses, not-for-profit organizations, and governmental entities through its network of 201 banking centers and 352 ATMs at year-end, as well as online and mobile banking services. Additionally, Webster Bank offers commercial real estate, asset-based lending, and equipment finance services regionally and provides health savings accounts nationwide through HSA Bank.

23.     Webster Bank is subject to regulation by the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, and is a member of the FDIC. Webster Bank's financial intermediation activities are organized around three main lines of business: Commercial Banking, Consumer Banking, and HSA Bank.  Webster Bank reported earnings of $628 million for the fiscal year 2022.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C § 1332(d), because the amount in controversy for the class and subclasses exceeds

$5,000,000 exclusive of interest and costs, there are more than 100 putative members of the class

and subclasses defined below, and at least one class member is a citizen of a state different from

Defendants to establish minimal diversity.

25.     This Court has personal jurisdiction over Defendants because they maintain their

principal places of business in Connecticut and/or regularly conduct business in this State.

26.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because

two of the Defendants' principal places of business are located in this District and a substantial

part of the events or omissions giving rise to the claims occurred in, were directed to, and/or

emanated from this District.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because

Defendants Webster Financial and Webster Bank reside in this District.

## FACTUAL ALLEGATIONS

**I.**     **Background**

28.     Webster Bank is a "leading commercial bank with more than $70 billion in

assets."[2]

29.     Webster Bank's security statement reads[3]:

> Identity theft and fraud can turn your life upside down. We take the
> privacy and security of your information seriously and our number
> one goal is to give you peace of mind when it comes to your
> protection.
>
> . . .

---

[2] https://public.websteronline.com/sites/default/files/documents/4Q22-company-overview.pdf
[3] https://public.websteronline.com/security

> Webster Bank uses enhanced security controls to keep your safety
> at the top of our list. Learn more about all we do to keep you safe.

30.     Plaintiffs and class members are past and current customers of Webster Bank and provided and entrusted Webster Bank with their most sensitive and confidential information, including their name, Social Security number, and bank account numbers.

31.     Defendants hire third-party vendors to assist with Webster Bank's operations. One such vendor is Guardian Analytics, Inc. Guardian provides "behavioral analytics and machine learning solutions for preventing banking fraud and anti-money laundering."[4]

32.     Guardian's privacy policy states:

> The privacy and protection of your personal information is important to us. We follow generally accepted industry standards to protect the personal information submitted to us, both during transmission and once we receive it
> …
> We use security software to protect the confidentiality of your personal information. In addition, our business practices are reviewed periodically for compliance with policies and procedures governing the security and confidentiality of our information. Our business practices limit employee access to confidential information, and limit the use and disclosure of such information to authorized persons.[5]

33.     Plaintiffs and class members reasonably relied on Webster Bank to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and class members also relied on Webster to ensure that the company held its vendors with whom it shared sensitive PII to the same high standards of data protection.

---

[4] https://guardiananalytics.com/about-guardian-analytics/
[5] https://guardiananalytics.com/privacy-policy/

34.    Defendants had duties to adopt reasonable measures to protect Plaintiffs and class members PII from involuntary disclosure to third parties.

**II.    <u>The Data Breach</u>**

35.    According to Defendants, beginning in November 2022, an unauthorized third-party began accessing the systems of a third-party vendor Webster Bank uses to provide anti-fraud services—Guardian Analytics, Inc. ("Guardian")—via a user's Virtual Private Network ("VPN") connection.

36.    The unauthorized third-party obtained credentials to user accounts and leveraged those accounts to perform network reconnaissance, install remote access tools, and encrypt systems.

37.    The unauthorized third-party accessed and obtained files and folders at various times between November 27, 2022, and January 17, 2023.

38.    According to Defendants, on or around January 14, 2023, the unauthorized third-party exfiltrated data from a non-production environment at Guardian. This data included the sensitive PII of purportedly at least 191,563 Webster Bank customers. Of those 191,563 customers, 153,754 (over 80%) are Connecticut customers.

39.    The data exfiltrated by the unauthorized and undetected third-party includes names together with bank account numbers and in tens of thousands of instances, corresponding Social Security numbers.

40.    While the exact figures for all impacted individuals are not public, what is presently known is that all 153,754 impacted Connecticut Webster Bank customers had their names and corresponding bank account numbers compromised in the Data Breach, and that approximately 36,476 of the 153,754 customers additionally had their Social Security numbers

compromised. Customers in other states including Maine, Massachusetts, and New York were impacted as well.

41.    The Data Breach was not discovered until January 26, 2023, the same day Defendants learned that an unauthorized third-party had gained access to the computer systems of Guardian.

42.    On January 27, 2023, Defendants confirmed that Webster Bank data, including customers' sensitive PII, was for sale on the dark web. Defendants began reviewing the data days later.

43.    On January 29, 2023, Guardian confirmed to Defendants that it had suffered a security incident, and on February 10, 2023, Guardian confirmed that Webster Bank's data had been compromised as part of the incident.

44.    Despite first discovering that Webster Bank data was for sale on the dark web in late January and getting further confirmation from Guardian in early February, Defendants did not begin notifying impacted Webster Bank customers, including plaintiffs and class members, of the Data Breach until April 10, 2023.

45.    On or about April 10, 2023, Defendants sent Plaintiffs and class members a Notice of Data Breach,[6] informing Plaintiffs and class members:

> What Happened?
>
> On January 26, 2023, Webster learned that Guardian experienced a data security incident that affected a select number of Webster clients. According to Guardian, upon detecting the incident, Guardian immediately activated their incident response plan and retained a third-party cybersecurity firm to conduct an investigation.
>
> Guardian's investigation revealed that unauthorized third parties accessed certain Guardian systems at various times between November 27, 2022 – January 22, 2023. During that time, the

---

[6] https://apps.web.maine.gov/online/aeviewer/ME/40/a42f73e8-720b-41a2-b892-18181e799668.shtml

unauthorized third parties acquired files that contained Webster clients' personal information from Guardian's systems and later posted the acquired files on the internet.

What Information Was Involved?

Webster reviewed the data that was taken from Guardian's systems and determined that it contained some of your personal information: your name, Social Security number and financial account number.

What We Are Doing?

Webster has retained third parties to assist with our independent investigation. Additionally, Webster is working with Guardian to ensure they implement enhanced security measures to safeguard their network, systems, and data, including that of Webster's clients. Guardian informed Webster that it has notified law enforcement and is cooperating with their investigation.

46.    The nearly two-and-a-half-month delay between discovery of the Data Breach and Defendants' disclosures to impacted individuals deprived Plaintiffs and class members of the ability to take steps to effectively mitigate the impact of the Data Breach.

47.    The unencrypted PII of Plaintiffs and class members has already been found for sale on the dark web, available for purchase by malicious actors, and may additionally fall into the hands of companies that will use the detailed PII for targeted marketing without the consent of Plaintiffs and class members. Unauthorized individuals can easily access the PII of Plaintiffs and class members.

48.    Defendants did not use reasonable security procedures or practices appropriate to the nature of the sensitive, unencrypted information they were maintaining for Plaintiffs and class members.

49.    Defendants did not explain why they waited nearly two-and-a-half months before notifying Plaintiffs and class members that their PII was compromised in the Data Breach.

50.    Because Defendants had duties to protect Plaintiffs' and class members' PII, Defendants knew or should have known that (i) unauthorized actors were targeting banks like Webster Bank and  financial analytics companies such as Guardian, (ii) unauthorized actors were aggressive in their pursuit of big companies such as Webster Bank and Guardian, (iii) unauthorized actors were leaking corporate information on dark web portals, and (iv) unauthorized actors' tactics included threatening to release stolen data.

51.    In light of the information readily available and accessible on the internet before the Data Breach, Defendants, having elected to share the unencrypted PII of its customers with Guardian, had reason to be on guard for the exfiltration of PII. In other words, Defendants', by nature of their businesses, had cause to be particularly on guard against such an attack.

52.    Prior to the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiffs' and class members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Prior to the Data Breach, Defendants knew or should have known that they should have encrypted the Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

### III.    Defendants Acquired Plaintiffs' and Class Members' PII and Shared that PII with Guardian Analytics

53.    As a condition of being a past or current customer of Webster Bank, Defendants required that Plaintiffs and class members entrust Webster Bank with highly sensitive PII.

54.    Defendants shared the PII of Plaintiffs and class members with Guardian, without adequate supervision or safeguards, and Guardian stored the PII on its Internet-accessible network.

55.    By obtaining, collecting, sharing, and storing the PII of Plaintiffs and class members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

56.    Plaintiffs and class members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

57.    To date, Defendants offered Plaintiffs and class members only two years of personal information misuse detection and identity protection support through Experian. The offered service is inadequate to protect Plaintiffs and class members from the threats they face for years to come, particularly in light of the PII at issue here.

**IV.    <u>Defendants Failed to Properly Secure Plaintiffs' and Class Members' PII</u>**

58.    Defendants could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiffs and class members. Alternatively, Defendants could have destroyed the data they no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

59.    Defendants' negligence in safeguarding the PII of Plaintiffs and class members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

60.    Despite the prevalence of public announcements of data breach and data security compromises, and Defendants' own promises regarding the privacy and security measures they implemented, Defendants failed to take appropriate steps to protect the PII of Plaintiffs and class members from being compromised.

V.    **Defendants Failed to Meet Their Obligations to Protect PII or Comply with Their Own Privacy Policies**

61.    Defendants' services are supported by privacy policies and security practices, which they provide on their publicly facing websites. Defendants have at all relevant times maintained a subpage on the Webster Bank website dedicated to touting and making representations regarding Webster Bank's data security and identity theft prevention efforts.[7]

62.    For example, Webster Bank maintains a subpage on its website entitled "Safety and Security" (the "Webster Data Security Subpage") touting its efforts to protect customer PII. The Webster Data Security Subpage states: "Identity theft and fraud can turn your life upside down. We take the privacy and security of your information seriously and our number one goal is to give you peace of mind when it comes to your protection . . . Webster Bank uses enhanced security controls to keep your safety at the top of our list. Learn more about all we do to keep you safe."[8]

63.    Given the sensitive nature of the PII which Plaintiffs and other class members entrusted to Defendants, Defendants knew, or should have known, that hackers and cybercriminals would be able to commit identity theft, financial fraud, phishing, socially engineered attacks, healthcare fraud, and other identity-related fraud if they were able to exfiltrate that data from Defendants' systems. Defendants each also knew that individuals whose PII was stored on their computer systems would be reasonable in spending time and effort to mitigate their damages and prevent identity theft and fraud if that data were exfiltrated.

64.    Given that Defendants were on notice that they were maintaining highly valuable data, for which Defendants knew there was a risk that they would be targeted by cybercriminals

---

[7] https://public.websteronline.com/security
[8] https://public.websteronline.com/security

and knew of the extensive harm that would occur if Plaintiffs' and class members' PII was exposed through a Data Breach, Defendants owed a duty to safeguard that information.

65.     Defendants also owed a duty to safeguard Plaintiffs' and class members' data based upon their explicit promises made to their customers to safeguard data, as well as the disclosures made in their data security policies and privacy policies. Defendants voluntarily undertook efforts to keep that data secure as part of their business model and thus owe a continuing obligation to Plaintiffs and class members to keep their PII secure.

66.     By being entrusted with Plaintiffs' and class members' PII, Defendants also had a special relationship with Plaintiffs and class members, which provided an independent duty of care. Defendants owed a duty to use reasonable security measures because they undertook to collect, store and use customers' PII. In addition, Defendants had a duty to require and ensure that Guardian would use reasonable security measures because it disclosed that same PII to Guardian.

67.     Accordingly, Defendants are liable to Plaintiffs and the class for the compromise and unauthorized disclosure of Plaintiffs' and class members' PII.

**VI.    Defendants Failed to Comply with Regulatory and Industry Standards**

68.     Because of the value of PII to hackers and identity thieves, companies in the business of obtaining, storing, maintaining, and securing PII, such as Defendants, have been identified as being particularly vulnerable to cyber-attacks. Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of

physical security systems; protection against any possible communication system; and training staff regarding critical points.[9] Organizations, companies, and banks—like Defendants—have an added incentive to harden their networks against unauthorized penetration, because they directly control the data necessary to access consumers' financial accounts.

69.     Further, federal and state governments have likewise established security standards and issued recommendations to reduce the number and size of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses, highlighting the importance of reasonable data and cyber security practices. According to the FTC, the need for data and cyber security should be factored into all business decision-making.[10]

### A.  FTC Guidance and Industry Standards

70.     Defendants are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

71.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data and cyber security principles and practices for business.[11] The guidelines note businesses should protect the personal customer and consumer information that they keep; properly dispose of personal

---

[9] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, Inc. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security/ [https://perma.cc/NY6X-TFUY].
[10] *Start with Security: A Guide for Business* at 2, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[11] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business [https://perma.cc/9945-U4HV].

information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[12] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

72.     The FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and (most pertinent here) verify that third-party service providers have implemented reasonable security measures.

73.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

74.     Defendants also have obligations created by other federal and state laws and regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical, administrative, and technical measures to keep Plaintiffs' and class members' PII confidential and to protect it from unauthorized access and disclosure.

75.     Given the magnitude of the risk and repercussions of a data breach or attack targeting this type of data, the likelihood of a data breach or attack, and Defendants' explicit

---

[12] *Id.*
[13] *Id.*

awareness of these vulnerabilities, Defendants should have taken every reasonable precaution in developing a robust security program and protecting Plaintiffs' and the class members' PII.

76.     Yet, despite their duties, representations, and promises, Defendants failed to adequately secure and protect their customers' data, allowing the Plaintiffs' and class members' PII to be accessed, disclosed, and misused.

77.     Defendants also owed a duty to comply with industry standards in safeguarding PII, which—as discussed herein—they did not do.

78.     Cyberattacks have become so notorious that the FBI and Secret Service issued an unprecedented warning in 2019 to potential targets so they were aware of, and prepared for, a potential attack.[14]

79.     The U.S. government, various U.S. and international law enforcement agencies, cybersecurity industry groups and laboratories, and numerous industry trade groups have issued warnings and guidance on managing and mitigating phishing and ransomware threats. There are industry best practices for cybersecurity related to phishing and ransomware, some of which are particularly effective.

80.     For example, in 2019, both Microsoft and Google publicly reported that using multi-factor authentication ("MFA") blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating "[t]ime to implement multi-factor authentication!"[15] An example of MFA implementation is receiving a text with a code when you

---

[14] Kochman, *supra* n.171.

[15] Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW]. Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW].

input your username and password into a website; even if a cybercriminal knew your username and password, the cybercriminal would not be able to see the code on your phone and would thus be blocked from accessing your online account.

81.     In this regard, implementing MFA "can block over 99.9 percent of account compromise attacks."[16]

82.     Yet, instead of following these widely adopted industry standards, Defendants failed to adequately secure and protect their customers' data, allowing the Plaintiffs' and class members' PII to be accessed, disclosed, and misused.

### VII.     The Value of the Compromised PII and Effects of Unauthorized Disclosure

83.     Defendants understand the protected PII they acquire, store, and utilize is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.

#### A.     The Value of PII

84.     PII is property with inherent and sizeable market value. Its value is axiomatic, considering the market value and profitability of "Big Data" corporations in America. Alphabet Inc., the parent company of Google, aptly illustrated this in its 2020 Annual Report, when it reported a total annual revenue of $182.5 billion and net income of $40.2 billion.[17] $160.7 billion of this revenue was derived from its Google business, which is driven almost exclusively by leveraging the PII it collects about the users of its various free products and services. America's

---

[16] *What Is Multi-Factor Authentication (MFA)?*, Consensus Techs. (Sept. 16, 2020), https://www.concensus.com/what-is-multi-factor-authentication/#:~:text=The%20proof%20 that%20MFA%20works,percent%20of%20account%20compromise%20attacks [https://perma.cc/RKT2-LX5Z].
[17] Alphabet Inc., Annual Report (Form 10-K) at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

largest corporations profit almost exclusively through the use of PII illustrating the considerable market value of PII.

85.     Criminal law also recognizes the value of PII and the serious nature of the theft of such an asset by imposing prison sentences. This strong deterrence is necessary because cybercriminals earn significant revenue through stealing PII. Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom or blackmail payment for its destruction, use the information to commit fraud or identity theft, or sell the PII to another cybercriminal on a thriving black market.

86.     Furthermore, PII is a valuable commodity to identity thieves, particularly when such data is aggregated in large numbers.  Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value."  The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information for sale on anonymous websites, making the information widely available to a criminal underworld.

87.     There is an active and robust market for this information. As John Sancenito, president of *Information Network Associates*, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

88.     Thus, Plaintiffs and class members rightfully place a high value not only on their PII, but also on the privacy of that data.

89.     Once stolen, PII can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and PII. Websites appear and disappear quickly, making it a dynamic environment.

90.     The forms of PII involved in this Data Breach are particularly concerning. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies to update the person's accounts with those entities.

91.     Indeed, even the Social Security Administration ("SSA") warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

92.     Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

## B.    Data Breaches Put Consumers at Increased Risk of Fraud and Identify Theft

93.     Cyberattacks and data breaches of financial services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[18]

94.     The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

95.     The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven

---

[18] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/
[19] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].

years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

96.     Cybercriminals use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

97.     Identity thieves can also use Social Security numbers to obtain a driver's license or other official identification card in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's PII to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by the Identity Theft Resource Center ("ITRC") shows the multitude of harms caused by fraudulent use of personal and financial information:

---

[20] *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps (last visited Mar. 23, 2021) [https://perma.cc/ME45-5N3A].



As set forth above, 96.7% of study subjects experienced costs or other harms from the criminal activity.[22] As illustrated in the above graphic, this includes devastating results such as "I lost my home/place of residence" and "I couldn't care for my family." Moreover, the harms of identity theft are not limited to the affected individual and may adversely impact other associated persons and support systems, including government assistance programs. In the ITRC study, nearly one third of survey respondents had to request government assistance as a result of the identity theft, such as welfare, EBT, food stamps, or similar support systems.[23] The ITRC study concludes that

---

[21] Jason Steele, *Credit Card and ID Theft Statistics*, Creditcards.com (updated Oct. 24, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php [https://web.archive.org/web/20171215215318/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php].
[22] *Id.*
[23] *Id.*

"identity theft victimization has an extreme and adverse effect on each individual as well as all of the support systems and people associated with the individual."[24]

98.     The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiffs and class members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

99.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

100.     It must also be noted there may be a substantial time lag—measured in years— between when harm occurs versus when it is discovered, and between when PII and/or financial information is stolen and when it is used. According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

PII is such an inherently valuable commodity to identity thieves that, once compromised, criminals often trade the information on the cyber black-market for years.

101.     Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (*e.g.*, donation history or hospital records), directly and materially

---

[24] *Id.*
[25] GAO Report, *supra* n.**Error! Bookmark not defined.**, at 29.

increase the chance that a potential victim is targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[26]

102.    There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiffs and class members are at an increased risk of fraud and identity theft for many years into the future. Indeed, some of the Plaintiffs and many class members are in very early stages of their lives—in their twenties and thirties. Thus, as the respective Notices advise, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

103.    As highly sophisticated parties that handle sensitive PII, Defendants failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and other class members' PII to protect against anticipated threats of intrusion of such information.

104.    The ramifications of Defendants' failure to keep Plaintiffs' and class members' PII secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer.  Thus, Plaintiffs and class members must vigilantly monitor their financial accounts *ad infinitum*.

105.    Thus, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached.

---

[26] *See* Kelion & Tidy, *supra* n.**Error! Bookmark not defined.** (concluding that personal information such as "names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information . . . . in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

106.    Thus, Plaintiffs and class mmbers are at an increased risk of fraud and identity theft for many years into the future.

### VIII.    The Data Breach Damaged Plaintiffs and Class Members.

107.    As a result of Defendants' deficient security and monitoring measures, Plaintiffs and class members have been harmed by the compromise of their sensitive personal information, which is currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

108.    Plaintiffs and class members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their Social Security numbers, bank account numbers, emails, phone numbers, and physical addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

109.    On information and belief, criminals have fraudulently applied for credit cards, filed false tax returns, and/or otherwise misused Plaintiffs' and class members' PII.

110.    Plaintiffs and class members also suffered a "loss of value" of their sensitive personal information when it was stolen by hackers in the Data Breach. A robust market exists for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information—at specific identifiable prices. This market serves to determine the loss of value to Plaintiffs and class members.

111.    As discussed above, Plaintiffs' and class members' stolen personal information is a valuable commodity to identity thieves.

112.    Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiffs and class members gathered from underground sources, public sources, or even Plaintiffs' and class members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiffs and class members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiffs' and class members' names, taking out loans in Plaintiffs' and class members' names, using Plaintiffs' and class members' information to obtain government benefits, filing fraudulent tax returns using Plaintiffs' and class members' information, obtaining Social Security numbers in Plaintiffs' and class members' names but with another person's photograph, and giving false information to police during an arrest.

113.    Plaintiffs and class members also suffered "benefit of the bargain" damages. Plaintiffs and class members overpaid for services that should have been—but were not—accompanied by adequate data security. Part of the interest and fees paid by Plaintiffs and class members to Webster Bank was intended to be used to fund adequate data security. Plaintiffs and class members did not get what they paid for.

114.    Plaintiffs and class members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach.

115.    Plaintiffs and class members may also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

116.    Class members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent class members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

117.    In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

118.    A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose personal information (including Social Security numbers) has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

119.    The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data

is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiffs and class members must vigilantly monitor their financial accounts *ad infinitum*.

### IX.    Defendants' Failure to Notify Plaintiffs and Class Members in a Timely or Adequate Fashion Exacerbated the Damage

120.    As detailed above, Defendants claim to have discovered the Data Breach on January 26, 2023 yet failed to even *begin* notifying Plaintiffs and class members until April 10, 2023 via U.S. Mail.

121.    First, Defendants appears to have chosen to notify individuals *only* via U.S. mail even though Webster Bank possesses contact information for each and every customer it knows which is likely more effective at reaching those individuals than U.S. mail.

122.    Second, the period of over two-and-a-half months during which Defendants sat on the information could have been used by Plaintiffs and class members to take steps to mitigate the damage caused by the Data Breach.

123.    Instead, and to protect its own financial interests, Defendants concealed the Data Breach for over two months, allowing the unauthorized third-party to potentially exploit Plaintiffs' and class members' PII without any mitigation steps being taken. Defendants did this despite *knowing that the information was for sale on the dark web*, a fact Defendants knew a day after discovering the Data Breach.

124.    Plaintiffs and members of the classes were thus deprived of the opportunity to take any steps to prevent damage by Defendants' concealment of the Data Breach and failure to provide timely and adequate notice of the Data Breach to Plaintiffs and class members.

## CLASS ALLEGATIONS

125.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Nationwide Class:

**Nationwide Class**: All natural persons residing in the United States whose Personally Identifiable Information was compromised as a result of the Data Breach.

126.    Plaintiffs reserve the right to modify, expand or amend the above Nationwide

Class definition or to seek certification of a class or classes defined differently than above before

any court determines whether certification is appropriate following discovery.

## CONNECTICUT SUBCLASS

127.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Connecticut Subclass:

**Connecticut Subclass**: All natural persons residing in Connecticut whose Personally Identifiable Information was compromised as a result of the Data Breach (the "Connecticut Subclass").

128.    Plaintiffs reserve the right to modify, expand or amend the above Connecticut

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## MASSACHUSETTS SUBCLASS

129.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Massachusetts Subclass:

**Massachusetts Subclass**: All natural persons residing in Massachusetts whose Personally Identifiable Information was compromised as a result of the Data Breach (the "Massachusetts Subclass").

130.    Plaintiffs reserve the right to modify, expand or amend the above Massachusetts

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

131.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1)**. The members of the class (and subclasses) are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While the exact number of class members is unknown to Plaintiffs at this time, based on information and belief, the class consists of tens of thousands of persons whose data was compromised in the Data Breach, who can be identified by reviewing the PII exfiltrated from Defendants' databases.

132.    **Commonality under Federal Rule of Civil Procedure 23(a)(2)**. There are questions of law and fact common to Plaintiffs and class members, which predominate over any questions affecting only individual class members. These common questions of law and fact include, without limitation:

    a.    Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and the class members' PII;

    b.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

    c.    Whether Defendants truthfully represented the nature of their security systems, including their vulnerability to hackers;

    d.    Whether Defendants' data security programs prior to and during the Data Breach complied with applicable data security laws and regulations;

    e.    Whether Defendants' data security programs prior to and during the Data Breach were consistent with industry standards;

    f.    Whether Defendants owed a duty to class members to safeguard their PII;

g.   Whether Defendants breached their duty to class members to safeguard their PII;

h.   Whether cyberhackers obtained, sold, copied, stored or released class members' PII;

i.   Whether Defendants knew or should have known that their data security programs and monitoring processes were deficient;

j.   Whether the class members suffered legally cognizable damages as a result of Defendants' misconduct;

k.   Whether Defendants' conduct was negligent;

l.   Whether Defendants' conduct was negligent per se; and

m.   Whether the class members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

133.   **Typicality under Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the class members because Plaintiffs' PII, like that of every class member, was compromised in the Data Breach.

134.   **Adequacy of Representation under Federal Rule of Civil Procedure (a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of class members, including those from states and jurisdictions where they may not reside, and they have no disabling conflicts of interest that would be averse to the other members of the class. Plaintiffs have retained Counsel that are competent and experienced in litigating complex consumer class action litigation and, in particular, privacy class action litigation. Plaintiffs intend to prosecute this action vigorously.

135.    **Predominance under Federal Rule of Civil Procedure 23(b)(3).** Defendants

have engaged in a common course of conduct toward Plaintiffs and the class members, in that all

Plaintiffs' and the class members' data at issue here was stored by Defendants and accessed

during the Data Breach. The common issues arising from Defendants' conduct affecting class

members, as described supra, predominate over any individualized issues. Adjudication of the

common issues in a single action has important and desirable advantages of judicial economy.

136.    **Superiority under Federal Rule of Civil Procedure 23(b)(3).** A class action is

superior to other available methods for the fair and efficient adjudication of this controversy.

Class treatment of common questions of law and fact is superior to multiple individual actions or

piecemeal litigation. Absent a class action, most class members would find that the cost of

litigating their individual claim is prohibitively high and would therefore have no effective

remedy. The prosecution of separate actions by individual class members would create a risk of

inconsistent or varying adjudications with respect to individual class members, which would

establish incompatible standards of conduct for Defendants. In contrast, the conduct of this

action as a class action presents far fewer management difficulties, conserves judicial resources

and the parties' resources, and protects the rights of each class member.

137.    **Injunctive Relief is Appropriate under Federal Rule of Civil Procedure**

**23(b)(2).** Defendants have failed to take actions to safeguard Plaintiffs' and class members' PII

such that injunctive relief is appropriate and necessary. Defendants have acted on grounds that

apply generally to the class (and subclasses) as a whole, so that class certification, injunctive

relief, and corresponding declaratory relief are appropriate on a class-wide basis.

138.    **Issue Certification Appropriate under Federal Rule of Civil Procedure**

**23(c)(4).** In the alternative, this litigation can be brought and maintained as a class action with

respect to particular issues, such as Defendants' liability with respect to the foregoing causes of action.

## CLAIMS FOR RELIEF

## COUNT 1

### NEGLIGENCE

139.    On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged herein.

140.    The Defendants required Plaintiffs and members of the class and subclasses to submit non-public, personal information in order to secure loans, mortgages, open bank accounts, and engage other financial services.

141.    In providing their PII, Plaintiffs and members of the class and subclasses had a reasonable expectation that this information would be securely maintained and not easily accessible to, or exfiltrated by cybercriminals.

142.    Defendants, as entities that collect sensitive, private data from consumers such as Plaintiffs and members of the class and subclasses, and likewise store and maintain that data, have a duty arising independently from any contract to protect that information.

143.    Specifically, Webster Bank, as a financial institution, had a duty to Plaintiffs and members of the class and subclass members to securely maintain the PII collected as promised, warranted, and in a reasonable manner which would prevent cybercriminals from accessing and exfiltrating this information.

144.    Further, Webster Bank had a duty to ensure that any third-party vendor to whom Webster Bank disclosed that sensitive PII would store and maintain that PII in a reasonable manner that would prevent cybercriminals from accessing and exfiltrating this PII.

145.    By undertaking the duty to maintain and secure this data, sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their systems and networks—and Plaintiffs and members of the class and subclass members' PII held within their systems—to prevent disclosure of the information, and to safeguard the information from cyber theft.

146.    Defendants' duty included a responsibility to implement systems and processes by which they could detect and prevent a breach of their security systems in an expeditious manner and to give prompt and adequate notice to those affected by a data breach and/or ransomware attack.

147.    Defendants owed a duty of care to Plaintiffs and members of the class and subclass members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected and safeguarded the PII of the Plaintiffs and members of the class and Subclasses.

148.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and members of the class and subclasses. While this special relationship exists independent from any contract, it is recognized by Webster Banks' Privacy Policy, as well as applicable laws and regulations. Specifically, Defendants actively solicited PII as part of their business and were solely responsible for and in the position to ensure that their systems were sufficient to protect against

the foreseeable risk of harm to Plaintiffs and members of the class and subclasses from a resulting data breach.

149.    Likewise, as the guardian and gatekeeper of Plaintiffs and members of the class and subclass members' PII, a special duty existed between Defendants and Plaintiffs and members of the class and subclasses to promptly and adequately provide notice of the Data Breach in a manner that would allow Plaintiffs and members of the class and Subclasses to take prompt and appropriate steps to safeguard their personal information.

150.    Defendants also had a common law duty to prevent foreseeable harm to others. Plaintiffs and class members were the foreseeable and probable victims of any inadequate security practices. It was foreseeable that Plaintiffs and class members would be harmed by the failure to protect their personal information because hackers are known to routinely attempt to steal such information and use it for nefarious purposes.

151.    Defendants knew or should have known that the Plaintiffs and members of the class and Subclasses were relying on Defendants to adequately safeguard and maintain their PII.

152.    Defendants had additional duties to safeguard Plaintiffs and members of the class and subclass members' data through federal and state regulations, including the FTC Act and state consumer protection statutes.

153.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

154.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect the Plaintiffs and members of the class and Subclass members'

data. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs and members of the class and Subclass members' PII;

- Failing to adequately monitor the security of their networks and systems;

- Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

- Allowing unauthorized access to and exfiltration of the PII of Plaintiffs and members of the class and subclasses; and

- Failing to timely detect that the PII of those Plaintiffs and members of the class and Subclasses had been compromised.

155.    It was foreseeable to Defendants that their failure to use reasonable measures to protect Plaintiffs and members of the class and Subclass members' PII would result in injury to Plaintiffs and members of the class and Subclasses. Further, the breach of security was reasonably foreseeable given the known high frequency of cybersecurity attacks and data breaches.

156.    It was therefore foreseeable to Defendants that their failure to adequately safeguard Plaintiffs and members of the class and Subclass members' PII would result in one or more types of injuries to Plaintiffs and members of the class and Subclasses.

157.    Plaintiffs are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

158.    Plaintiffs are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security programs and monitoring procedures; (ii) submit to future annual

audits of those systems and monitoring procedures; and (iii) immediately provide robust and adequate lifetime credit monitoring to all class members, and any other relief this Court deems just and proper.

## COUNT 2

### DECLARATORY JUDGMENT

159.     On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged herein.

160.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

161.     An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiffs and members of the class and subclass members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs, the class and subclass members from further, future data breaches that compromise their PII.

162.     Plaintiffs and members of the class and subclasses allege that Defendants' data security measures remain inadequate, and Defendants have not provided any evidence that they have remedied the failure that occurred in the Data Breach at issue or have remedied any other vulnerability from their failure to properly assess threats by cybercriminals.

163.    Plaintiffs and members of the class and subclasses continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

164.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

165.    Defendants continue to owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, the FTC Act and various state statutes;

166.    Defendants owe a duty by virtue of their special relationship, understanding that they are safeguarding sensitive, PII, or that they have already acknowledged a responsibility to keep such information safe by virtue of security policies; and

167.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

168.    If an injunction is not issued, Plaintiffs, the class and subclass members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach of Defendants' systems occurs, Plaintiffs, the class and subclass members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

169.    The hardship to Plaintiffs and members of the class and subclasses if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach of Defendants' systems occurs, Plaintiffs and member of the class and subclasses will likely be subjected to substantial identify theft and other damage (as they cannot elect to store their information with another company). On the other

hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

170.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by helping to prevent another data breach of Defendants' systems, thus eliminating the additional injuries that would result to Plaintiffs and the tens of thousands of consumers whose PII would be further compromised.

## COUNT 3

### INVASION OF PRIVACY

171.    On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged herein.

172.    Plaintiffs and members of the class and subclasses have a legally protected privacy interest in their PII, which is and was collected, stored and maintained by Defendants, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access, as occurred with the Data Breach.

173.    Plaintiffs and members of the class and subclasses reasonably expected that Defendants would protect and secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

174.    Defendants unlawfully invaded the privacy rights of Plaintiffs and members of the class and subclasses by engaging in the conduct described above, including by failing to protect their PII by permitting unauthorized third parties to access, exfiltrate and view this PII.

175.    This invasion of privacy resulted from Defendants' failure to properly secure and maintain Plaintiffs, the class and subclass members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded data.

176.    Plaintiffs, the class and subclass members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiffs, the class and subclass members' PII, and such information is otherwise protected from exposure to the public by various statutes, regulations and other laws.

177.    The disclosure of Plaintiffs, the class and subclass members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

178.    Defendants' willful and reckless conduct which permitted unauthorized access, exfiltration and disclosure of Plaintiffs' and the class and subclass members' sensitive, PII is such that it would cause serious mental injury, shame or humiliation to people of ordinary sensibilities.

179.    The unauthorized access, exfiltration, and disclosure of Plaintiffs, the class and subclass members' PII was without their consent, and in violation of various statutes, regulations and other laws.

180.    As a result of the invasion of privacy caused by Defendants, Plaintiffs, the class and subclass members suffered and will continue to suffer damages and injury as set forth herein.

181.    Plaintiffs, the class and subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution, injunctive relief, reasonable attorneys' fees and costs, and any other relief that is just and proper.

182.    Plaintiffs and class members are entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security programs and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide robust and adequate credit monitoring to Plaintiffs and class and subclass members; and any other relief this Court deems just and proper.

## COUNT 4

### BREACH OF EXPRESS CONTRACT
### (On Behalf of the Nationwide Class or alternatively, the State Subclasses))

183.    On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged herein.

184.    Plaintiffs and Class Members formed a contract when Plaintiffs and Class Members obtained products or services from Defendants.

185.    Plaintiffs and Class Members fully performed their obligations under the contracts with Defendants.

186.    Defendants breached the agreement with Plaintiffs and Class Members by failing to protect their PII. Specifically, it (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties, in violation of the agreement.

187.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and

economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal

sale of the compromised PII on the black market; mitigation expenses and time spent on credit

monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to

the Data Breach reviewing bank statements, credit card statements, and credit reports, among

other related activities; expenses and time spent initiating fraud alerts; decreased credit scores

and ratings; lost work time; lost value of the PII; lost value of access to their PII permitted by

Defendants; the amount of the actuarial present value of ongoing high-quality identity defense

and credit monitoring services made necessary as mitigation measures because of Defendants'

Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and

general damages; and other economic and non-economic harm.

## COUNT 5

### BREACH OF IMPLIED CONTRACT
### (On behalf of the Nationwide Class, or alternatively, the State Subclasses)

188.    On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of

Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged

herein.

189.    When Plaintiffs and Class Members provided their sensitive personal information

to Defendants in exchange for Defendants' services, they entered into implied contracts with

Defendants under which Defendants agreed to take reasonable steps to protect their sensitive

personal information.

190.    Defendants solicited and invited Plaintiffs and Class Members to provide their

sensitive personal information as part of their regular business practices. Indeed, to sign up for a

Nelnet account—which is required to make payments online to loan serviced by companies that

hire Nelnet for web portal and payment processing services—Nelnet requires customers to

provide sensitive personal information including Social Security numbers, to obtain Nelnet's services. Plaintiffs and Class Members accepted Nelnet's offers and provided their sensitive personal information Nelnet.

191.    Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Nelnet.

192.    Plaintiffs and Class Members paid money (directly and/or indirectly) to Defendants and Plaintiffs and Class Members therefore reasonably believed and expected that Defendants would use part of those funds to obtain and oversee adequate data security. Defendants failed to do so.

193.    Plaintiffs and Class Members would not have provided their sensitive personal information to Defendants in the absence of Defendants' implied promise to keep their sensitive personal information reasonably secure.

194.    Plaintiffs and Class Members fully performed their obligations under the implied contracts by paying money to Defendants.

195.    Defendants breached its implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

196.    As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

197.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, among other things: (i) strengthen its data security systems and monitoring

procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit

monitoring and identity theft insurance to all Class Members.

## COUNT 6

**CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)**
**Conn. Gen. Stat. §§ 42-110a *et seq*.**
**(On Behalf of Plaintiffs Friar, Courey, Fedorczyk the Connecticut Subclass)**

198.    On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of

Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged

herein.

199.    Defendants are each a "person" as defined by Conn. Gen. Stat. § 42-110a(3).

200.    Defendants engaged in unfair and deceptive acts and practices in the conduct of

trade or commerce, in violation of Conn. Gen. Stat. § 42-110b(a).

201.    Defendants' representations and omissions include both implicit and explicit

representations.

202.    Defendants' unfair and deceptive acts and practices include:

    a.    Failing to implement and maintain reasonable security and privacy measures

        to protect Plaintiffs Friar's, Courey's, Fedorczyk's, and Connecticut Subclass

        members' PII, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify foreseeable security and privacy risks, and remediate

        identified security and privacy risks, which was a direct and proximate cause

        of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the

        security and privacy of Plaintiffs Friar's, Courey's, Fedorczyk's, and

        Connecticut Subclass members' PII, including duties imposed by the FTC Act,

15 U.S.C. § 45 and Connecticut security breach law, Conn. Gen. Stat. § 36a-701b;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs Friar's, Courey's, Fedorczyk's, and Connecticut Subclass members' PII, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Friar's, Courey's, Fedorczyk's, and Connecticut Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Connecticut security breach law, Conn. Gen. Stat. § 36a-701b;

f.  Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs Friar's, Courey's, Fedorczyk's, and Connecticut Subclass members' PII; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Friar's, Courey's, Fedorczyk's,and Connecticut Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Connecticut security breach law, Conn. Gen. Stat. § 36a-701b.

203.  Defendants' acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

204.  Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiffs Friar, Courey, Fedorczyk, and the

Connecticut Subclass members, that their PII was not exposed and misled Plaintiffs Friar,

Courey, Fedorczyk, and the Connecticut Subclass members into believing they did not need to

take actions to secure their identities.

205.    The injury to consumers from Defendants' conduct was and is substantial because

it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk

to the safety of their PII or the security of their identity or credit.

206.    The injury to consumers was substantial not only because it inflicted harm on a

significant and unprecedented number of consumers, but also because it inflicted a significant

amount of injury which consumers could not have reasonably avoided because Defendants'

business acts and practices unreasonably created or took advantage of an obstacle to the free

exercise of consumer decision-making. By withholding important information from consumers

about the inadequacy of their data security programs, Defendants created an asymmetry of

information between themselves and consumers that precluded consumers from taking action to

avoid or mitigate injury.

207.    Defendants' inadequate data security had no countervailing benefit to consumers

or to competition.

208.    Defendants also engaged in "deceptive" acts and practices in violation of Conn.

Gen. Stat. § 42-110b(a), including:

> a.  Misrepresenting that the subject of a consumer transaction has sponsorship,
>
>     approval, performance, characteristics, accessories, uses, or benefits it does
>
>     not have which the supplier knows or should reasonably know it does not
>
>     have;

b.  Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

c.  Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects.

209.    Defendants intended to mislead Plaintiffs Friar, Courey, Fedorczyk, and Connecticut Subclass members and induce them to rely on their misrepresentations and omissions.

210.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

211.    Had Defendants disclosed to Plaintiffs Friar, Courey Fedorczyk, the class and Connecticut Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiffs Friar, Courey, and Fedorczyk, the class, and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls, and the security controls of their agents and representatives, secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass

members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

212.    Defendants had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extent of the PII in their possession. This duty arose because Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls, and the security controls of their agents and representatives, a secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered. In addition, such a duty is implied by law due to the nature of the relationship between consumers— including Plaintiffs Friar, Courey, Fedorczyk, the class and the Connecticut Subclass—and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants.

213.    Consumers could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of their data security programs, Defendants created an asymmetry of information between them and consumers that precluded consumers from taking action to avoid or mitigate injury.

214.    Defendants' inadequate data security had no countervailing benefit to consumers or to competition.

215.    Defendants also engaged in "deceptive" acts and practices in violation of Conn. Gen. Stat. § 42-110b(a), including:

    a.  Misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have;

    b.  Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

    c.  Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects.

216.    Defendants intended to mislead Plaintiffs Friar, Courey, Fedorczyk, and Connecticut Subclass members and induce them to rely on their misrepresentations and omissions.

217.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

218.    Had Defendants disclosed to Plaintiffs Friar, Courey, Fedorczyk, class members and the Connecticut Subclass, that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and would have been forced

to adopt reasonable data security measures and comply with the law. Instead, Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls, and the security controls of their agents and representatives, secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiffs, the class, and the Connecticut Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

219.    Defendants had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extent of the PII in their possession. This duty arose because Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls, and the security controls of their agents and representatives, a secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered. In addition, such a duty is implied by law due to the nature of the relationship between consumers— including Plaintiffs Friar, Courey, Fedorczyk, the class, and the Connecticut Subclass—and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants.

220.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiffs Friar, Courey, Fedorczyk, and Connecticut Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

221.    Defendants' violations present a continuing risk to Plaintiffs Friar, Courey, Fedorczyk, and Connecticut Subclass members as well as to the general public.

222.    Plaintiffs Friar, Courey, Fedorczyk, and Connecticut Subclass members seek all monetary and non-monetary relief allowed by law under Conn. Gen. Stat. § 42-110g(a), including actual damages; punitive damages; injunctive relief; restitution; reasonable attorneys' fees and costs; and any other relief that the Court deems appropriate.

## COUNT 7

### VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT
### Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.*
### (On Behalf of Plaintiff Melo and the Massachusetts Subclass)

223.    On behalf of Plaintiffs and the nationwide class, or alternatively, on behalf of Plaintiffs and the subclasses Plaintiffs repeat and reallege Paragraphs 1-124, as if fully alleged herein.

224.    Defendants are each "persons" as defined by Mass. Gen. Laws ch. 93A, § 1(a).

225.    Defendants engaged in unfair and deceptive acts or practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws ch. 93A, § 2(a).

226.    Defendants' representations and omissions include both implicit and explicit representations.

227. Defendants' unfair and deceptive acts or practices include, but are not limited to:

   a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Melo and Massachusetts Subclass members' PII, which was a direct and proximate cause of the Data Breach;

   b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

   c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Melo and Massachusetts Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

   d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff and Massachusetts Subclass members' PII, including by implementing and maintaining reasonable security measures;

   e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Melo and Massachusetts Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

   f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Melo and Massachusetts Subclass members' PII; and

   g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and

privacy of Plaintiff Melo and Massachusetts Subclass members' PII, including

duties imposed by the FTC Act, 15 U.S.C. § 45.

228.    Defendants' acts and practices were unfair because they caused or were likely to

cause substantial injury to consumers, which was not reasonably avoidable by consumers

themselves and not outweighed by countervailing benefits to consumers or to competition.

229.    Defendants' representations and omissions were material because they were likely

to deceive reasonable consumers, including Plaintiffs and the Massachusetts Subclass members,

that their PII was not exposed and misled Plaintiffs and the Massachusetts Subclass members

into believing they did not need to take actions to secure their identities.

230.    The injury to consumers from Defendants' conduct was and is substantial because

it involved a monetary injury and an unwarranted risk to the safety of their PII or the security of

their identity or credit. The injury to consumers was substantial not only because it inflicted harm

on a significant and unprecedented number of consumers, but also because it inflicted a

significant amount of harm on each consumer.

231.    Consumers could not have reasonably avoided injury because Defendants'

business acts and practices unreasonably created or took advantage of an obstacle to the free

exercise of consumer decision-making. By withholding important information from consumers

about the inadequacy of their data security programs, Defendants created an asymmetry of

information between them and consumers that precluded consumers from taking action to avoid

or mitigate injury.

232.    Defendants' inadequate data security measures were not outweighed by any

countervailing benefits to consumers or to competition. Defendants' business practices did not

promote, nor were they essential to, efficiency, innovation, or any other legitimate business interest.

233.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff Melo and the Massachusetts Subclass members have suffered injury in fact, including but not limited to, the loss of their PII, increased risk of identity theft, credit and reputational harm, and financial losses as a result of the Data Breach.

234.    Plaintiff Melo and the Massachusetts Subclass members seek actual damages, multiple damages, attorneys' fees, costs, and any other just and proper relief available under Mass. Gen. Laws ch. 93A, §§ 9 and 11, resulting from Defendants' violation of Mass. Gen. Laws ch. 93A, § 2(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their Counsel to represent the class and subclasses;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the class and subclass members' PII, and to mitigate further harm;

C.    For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity all types and kinds of PII compromised during the Data Breach;

D.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F.      For an award of punitive damages, as allowable by law;

G.      For an award of attorneys' fees and costs, and any other expense, including reasonable expert witness fees;

G.      Pre- and post-judgment interest on any amounts awarded; and

H.      Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial for all claims so triable.

Respectfully submitted,

DATED: May 15, 2023                     */s/ Ian W. Sloss*
Ian W. Sloss
Zachary A. Rynar
SILVER GOLUB & TEITELL LLP
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Fax: (203) 325-3769
isloss@sgtlaw.com
zrynar@sgtlaw.com

James J. Pizzirusso*
jpizzirusso@hausfeld.com
Amanda Boltax*
mboltax@hausfeld.com
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 540-7200

Steven M. Nathan*
snathan@hausfeld.com
HAUSFELD LLP
33 Whitehall St., 14th Floor

New York, New York 10004
Telephone: (646) 357-1100

*Pro hac vice forthcoming*